Filed 5/19/25  Capital Auto Financial v. Ohana CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| CAPITAL AUTO FINANCIAL, INC., | B333357 |
| Plaintiff, Cross-defendant and Respondent, | (Los Angeles County Super. Ct. No. 19BBCV01010) |
| v. | |
| JACQUES OHANA et al., | |
| Defendants, Cross-complainants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Frank M. Tavelman, Judge.  Reversed with directions.

O'Neil & Matusek and Henry John Matusek II for Defendants, Cross-complainants and Appellants.

Lebedev, Michael & Helmi and Gennady L. Lebedev for Plaintiff, Cross-defendant and Respondent.

———————————

Capital Auto Financial, Inc. leased and occupied the first floor of Jacques and Simon Ohana's commercial building in Studio City for about five years. The parties' lease agreement required Capital Auto to pay for its electricity use, calculated as the difference between the total electricity usage (as measured by a main meter) and the electricity Capital Auto did not use on the building's second floor (as measured by a second meter). The second-floor meter, however, did not exist, which led to confusion over utilities payments. After the lease ended, Capital Auto filed a complaint against the Ohanas alleging overpayment of rent and other expenses; the Ohanas filed a cross-complaint against Capital Auto alleging underpayment of rent and other expenses. Following a bench trial, the court found mutual breach of contract and awarded net damages to Capital Auto. On appeal, the Ohanas argue the trial court erred in calculating damages based on its misinterpretation of the lease agreement. We agree and reverse the judgment with directions for the trial court to recalculate the parties' damages.

## FACTUAL AND PROCEDURAL BACKGROUND

Capital Auto leased approximately 4,000 square feet of the Ohanas' Studio City commercial building. The leased premises comprised 42 percent of the building—the entire first floor. The lease began on May 1, 2014, and ended on June 30, 2019.

On November 7, 2019, Capital Auto filed a complaint against the Ohanas, asserting multiple causes of action relating to its belief that the Ohanas overcharged it for rent and other expenses. On December 17, 2019, the Ohanas filed a cross-complaint, alleging various breaches of the lease, including Capital Auto's failure to pay certain rents and its share of other

2

expenses. The parties waived their right to a jury trial, and in November 2022, a three-day court trial was held. In December 2022, the parties filed closing argument briefs. In April 2023, the trial court issued a tentative decision and entertained the parties' objections.

On July 7, 2023, the court issued its final ruling. The court explained "[m]ost facts at trial were undisputed" and the parties understood there were inaccuracies in the Ohanas' collection of Capital Auto's share of utilities. The resolution of how much Capital Auto owed in utilities over the life of the lease came down to the interpretation of the lease. Based on its interpretation of the lease, the court determined the Ohanas overbilled Capital Auto in the amount of $56,512.49. The court further found that Capital Auto was entitled to return of its security deposit in the amount of $6,620. As for the Ohanas' cross-complaint, the court determined that Capital Auto wrongfully withheld rent from the Ohanas in the amount of $16,550. The court calculated and ordered net damages in favor of Capital Auto in the amount of $46,582.49 (i.e., $56,512.49 plus $6,620 minus $16,550). Finally, the court determined this was a mutual breach of contract and each party was to pay its attorney's fees, costs, and expenses.

In August 2023, the Ohanas filed a motion to vacate the judgment or, in the alternative, for a new trial. In September 2023, Capital Auto filed its opposition. On October 3, 2023, the court denied the motion.

The Ohanas timely appealed.[1]

---

[1] In their notice of appeal, the Ohanas purport to appeal from both the judgment and the "denial of motion for new trial." An order denying a motion for a new trial is not appealable;

3

# DISCUSSION

"'A lease agreement is subject to the general rules governing the interpretation of contracts. [Citation.] "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful."'" (*Eucasia Schools Worldwide, Inc. v. DW August Co.* (2013) 218 Cal.App.4th 176, 181.) "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." (Civ. Code, § 1638.) We construe the language of the contract in the context of the instrument as a whole, applying the common understanding of the words used, while also considering what is reasonably meant in context. (*Mount Vernon Fire Ins. Co. v. Busby* (2013) 219 Cal.App.4th 876, 882.) When a contract contains a mistake of fact, the mistake is to be disregarded to give effect to the real intention of the parties. (See Civ. Code, § 1640 ["When, through fraud, mistake, or accident, a written contract fails to express the real intention of the parties, such intention is to be regarded, and the erroneous parts of the writing disregarded"].) Mistakes of fact include "[b]elief[s] in the present existence of a thing material to the contract, which does not exist." (Civ. Code, § 1577.) Finally, we review de novo the trial court's interpretation of the meaning of the terms of a lease contract. (See *Baca v. Kuang* (2025) 107 Cal.App.5th 1292, 1297 [de novo review is appropriate because "'[t]he precise meaning of

---

however, it is reviewable on appeal from the underlying judgment. (*Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 19.)

4

any contract, including a lease, depends upon the parties' expressed intent, using an objective standard'"].)

The intent of the parties as set forth in the lease was that Capital Auto would pay its share of the electricity bill. The lease addendum states Capital Auto's "electric bill is calculated based on the difference from the main meter and the meter for the second floor." It is undisputed, however, that the parties mistakenly believed there was one main electricity meter and one specific meter for the electricity use on the second floor, i.e., the area of the building Capital Auto did not occupy. As it turned out, a separate meter measuring electricity use on the second floor did not exist.[2] If the parties' belief had been correct, the formula would have ensured that Capital Auto would pay for all of its electricity use.

Given the mistake in the parties' belief about the existence of a second meter, the question is how best to give effect to the parties' intent that Capital Auto pay for its electricity use. Paragraph 11.2 of the lease supplies the answer: "If a service is deleted by Paragraph 1.13 and such service is not separately metered to the Premises, [Capital Auto] shall pay at [the Ohanas'] option, either Lessee's Share or a reasonable proportion to be determined by [the Ohanas] of all charges of such jointly metered service." Paragraph 1.13, in turn, describes electricity as a "deleted" service, stating that the Ohanas are "NOT obligated to provide . . . [e]lectricity" to Capital Auto. In other words, Capital Auto was required to pay for its electricity use and, given that electricity "is not separately metered" to the

---

[2]    There was a meter on the second floor, but it only measured air-conditioning use.

leased premises, Capital Auto was required to pay either the "Lessee's Share" (defined as 42 percent, i.e., the percentage of the building Capital Auto occupied) or a reasonable proportion of the electricity as the Ohanas determined. The lease permitted the Ohanas to choose between the two options During trial, the Ohanas provided an accounting seeking 42 percent.

Rather than looking to paragraph 11.2, the trial court resolved the factual mistake in the lease regarding the existence of two separate meters by looking instead to paragraph 4.2 of the lease dealing with "Operating Expenses." The practical effect of treating electricity as an operating expense is that Capital Auto would not pay a 42 percent share of the total electricity the building used; instead, Capital Auto would pay only 42 percent of the increase above what the Ohanas were paying before Capital Auto moved in, beginning a year after the lease term began. Specifically, paragraph 4.2 of the lease is titled "Operating Expense Increase" and states that "[Capital Auto] shall pay to [the Ohanas] during the term hereof, in addition to the Base Rent, [42 percent] of the amount by which all Operating Expenses for each Comparison Year exceeds the amount of all Operating Expenses for the Base Year [i.e., 2014]." The "Comparison Year" is "each calendar year during the term of this Lease subsequent to the Base Year; provided, however, [Capital Auto] shall have no obligation to pay a share of the Operating Expense Increase applicable to the first 12 months of the Lease Term."

Capital Auto's private electricity use is not an "Operating Expense[]," as defined in the lease. Therefore, the "Operating Expense Increase" provision does not apply.

6

First, "Operating Expenses" in paragraph 4.2 of the lease are costs relating to the operation, ownership, and maintenance of the entire "Project," which included not just Capital Auto's leased premises, but the common areas, the building, and the land. Among the list of "Operating Expenses" are "[t]he cost of water, sewer, gas, electricity, and other publicly mandated services not separately metered." Other examples of "Operating Expenses" are costs relating to the operation, repair, and maintenance of common areas, plumbing, heating and air conditioning systems, and "[a]ll other areas and improvements that are within the exterior boundaries of the Project but outside of the [leased] Premises"; trash disposal, janitorial and security services, and pest control; premiums for the insurance policies the Ohanas maintained for the building and common areas; and real property taxes. The operating expenses in paragraph 4.2 therefore contemplate shared costs of running the building as a whole, not costs like the electricity use at issue, which is directly associated with Capital Auto's exclusive use of its leased premises.

Second, as discussed, the lease reflects an intent that Capital Auto pay for its electricity use. That was the purpose of the (albeit factually inaccurate) addendum provision regarding the separate meters and the express exclusion of electricity as a lessor-provided utility. Treating Capital Auto's private electricity usage as a general operational cost for the building and property as a whole would not give effect to the parties' intent. Nor would treating Capital Auto's electricity usage as an excess cost to be shared. If Capital Auto's electricity usage were an "Operating Expense Increase," Capital Auto would not be required to pay for its electricity at all for the first 12 months of the lease term and

thereafter would only have to pay 42 percent in excess of yearly increases to the cost of electricity. This is inconsistent with the parties' intent that Capital Auto pay for its electricity use.

Because paragraph 11.2 of the lease governs Capital Auto's electricity bill payment, the Ohanas are entitled to 42 percent of the total electricity costs incurred during the life of the lease.[3]

## DISPOSITION

The judgment is reversed, and the trial court is directed to recalculate the parties' damages. Appellants shall recover their costs on appeal.

PULOS, J.*

We concur:

SEGAL, Acting P. J.

STONE, J.

---

[3] We need not address the Ohanas' challenge to the trial court's denial of their motion for a new trial. The request for a new trial was based on the trial court's error in interpreting the contract and awarding damages, both of which we now resolve in the Ohanas' favor.

* Judge of the San Diego County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

8